(Slip Opinion) OCTOBER TERM, 2023 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## LINDKE *v.* FREED

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

No. 22–611.  Argued October 31, 2023—Decided March 15, 2024

James Freed, like countless other Americans, created a private Facebook profile sometime before 2008.  He eventually converted his profile to a public "page," meaning that *anyone* could see and comment on his posts.  In 2014, Freed updated his Facebook page to reflect that he was appointed city manager of Port Huron, Michigan, describing himself as "Daddy to Lucy, Husband to Jessie and City Manager, Chief Administrative Officer for the citizens of Port Huron, MI."  Freed continued to operate his Facebook page himself and continued to post prolifically (and primarily) about his personal life.  Freed also posted information related to his job, such as highlighting communications from other city officials and soliciting feedback from the public on issues of concern.  Freed often responded to comments on his posts, including those left by city residents with inquiries about community matters.  He occasionally deleted comments that he considered "derogatory" or "stupid."

After the COVID–19 pandemic began, Freed posted about it.  Some posts were personal, and some contained information related to his job.  Facebook user Kevin Lindke commented on some of Freed's posts, unequivocally expressing his displeasure with the city's approach to the pandemic.  Initially, Freed deleted Lindke's comments; ultimately, he blocked him from commenting at all.  Lindke sued Freed under 42 U. S. C. §1983, alleging that Freed had violated his First Amendment rights.  As Lindke saw it, he had the right to comment on Freed's Facebook page because it was a public forum.  The District Court determined that because Freed managed his Facebook page in his private capacity, and because only state action can give rise to liability under §1983, Lindke's claim failed.  The Sixth Circuit affirmed.

*Held*: A public official who prevents someone from commenting on the official's social-media page engages in state action under §1983 only if

the official both (1) possessed actual authority to speak on the State's behalf on a particular matter, and (2) purported to exercise that authority when speaking in the relevant social-media posts. Pp. 5–15.

(a) Section 1983 provides a cause of action against "[e]very person who, *under color of any statute, ordinance, regulation, custom, or usage, of any State*" deprives someone of a federal constitutional or statutory right. (Emphasis added.) Section 1983's "under color of" text makes clear that it is a provision designed as a protection against acts attributable to a State, not those of a private person. In the run-of-the-mill case, state action is easy to spot. Courts do not ordinarily pause to consider whether §1983 applies to the actions of police officers, public schools, or prison officials. Sometimes, however, the line between private conduct and state action is difficult to draw. In *Griffin* v. *Maryland*, 378 U. S. 130, for example, it was the source of the power, not the identity of the employer, which controlled in the case of a deputized sheriff who was held to have engaged in state action while employed by a privately owned amusement park. Since *Griffin*, most state-action precedents have grappled with whether a nominally private person engaged in state action, but this case requires analyzing whether a *state official* engaged in state action or functioned as a private citizen.

Freed's status as a state employee is not determinative. The distinction between private conduct and state action turns on substance, not labels: Private parties can act with the authority of the State, and state officials have private lives and their own constitutional rights—including the First Amendment right to speak about their jobs and exercise editorial control over speech and speakers on their personal platforms. Here, if Freed acted in his private capacity when he blocked Lindke and deleted his comments, he did not violate Lindke's First Amendment rights—instead, he exercised his own. Pp. 5–8.

(b) In the case of a public official using social media, a close look is definitely necessary to categorize conduct. In cases analogous to this one, precedent articulates principles to distinguish between personal and official communication in the social-media context. A public official's social-media activity constitutes state action under §1983 only if the official (1) possessed actual authority to speak on the State's behalf, and (2) purported to exercise that authority when he spoke on social media. The appearance and function of the social-media activity are relevant at the second step, but they cannot make up for a lack of state authority at the first. Pp. 8–15.

(1) The test's first prong is grounded in the bedrock requirement that "the conduct allegedly causing the deprivation of a federal right be *fairly attributable to the State." Lugar* v. *Edmondson Oil Co.*, 457 U. S. 922, 937 (emphasis added). Lindke's focus on appearance skips

over this critical step. Unless Freed was "possessed of state authority" to post city updates and register citizen concerns, *Griffin*, 378 U. S., at 135, his conduct is not attributable to the State. Importantly, Lindke must show more than that Freed had *some* authority to communicate with residents on behalf of Port Huron. The alleged censorship must be connected to speech on a matter within Freed's bailiwick. There must be a tie between the official's authority and "the gravamen of the plaintiff's complaint." *Blum* v. *Yaretsky*, 457 U. S. 991, 1003.

To misuse power, one must possess it in the first place, and §1983 lists the potential sources: "statute, ordinance, regulation, custom, or usage." Determining the scope of an official's power requires careful attention to the relevant source of that power and what authority it reasonably encompasses. The threshold inquiry to establish state action is not whether making official announcements *could* fit within a job description but whether making such announcements is *actually* part of the job that the State entrusted the official to do. Pp. 9–12.

   (2) For social-media activity to constitute state action, an official must not only have state authority, he must also purport to use it. If the official does not speak in furtherance of his official responsibilities, he speaks with his own voice. Here, if Freed's account had carried a label—*e.g.,* "this is the personal page of James R. Freed"—he would be entitled to a heavy presumption that all of his posts were personal, but Freed's page was not designated either "personal" or "official." The ambiguity surrounding Freed's page requires a fact-specific undertaking in which posts' content and function are the most important considerations. A post that expressly invokes state authority to make an announcement not available elsewhere is official, while a post that merely repeats or shares otherwise available information is more likely personal. Lest any official lose the right to speak about public affairs in his personal capacity, the plaintiff must show that the official purports to exercise state authority in specific posts. The nature of the social-media technology matters to this analysis. For example, because Facebook's blocking tool operates on a page-wide basis, a court would have to consider whether Freed had engaged in state action with respect to any post on which Lindke wished to comment. Pp. 12–15.

37 F. 4th 1199, vacated and remanded.

   BARRETT, J., delivered the opinion for a unanimous Court.

NOTICE: This opinion is subject to formal revision before publication in the
United States Reports. Readers are requested to notify the Reporter of
Decisions, Supreme Court of the United States, Washington, D. C. 20543,
pio@supremecourt.gov, of any typographical or other formal errors.

# SUPREME COURT OF THE UNITED STATES

———

No. 22–611

———

## KEVIN LINDKE, PETITIONER *v.* JAMES R. FREED

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SIXTH CIRCUIT

[March 15, 2024]

JUSTICE BARRETT delivered the opinion of the Court.

Like millions of Americans, James Freed maintained a
Facebook account on which he posted about a wide range of
topics, including his family and his job. Like most of those
Americans, Freed occasionally received unwelcome com-
ments on his posts. In response, Freed took a step familiar
to Facebook users: He deleted the comments and blocked
those who made them.

For most people with a Facebook account, that would
have been the end of it. But Kevin Lindke, one of the un-
welcome commenters, sued Freed for violating his right to
free speech. Because the First Amendment binds only the
government, this claim is a nonstarter if Freed posted as a
private citizen. Freed, however, is not only a private citizen
but also the city manager of Port Huron, Michigan—and
while Freed insists that his Facebook account was strictly
personal, Lindke argues that Freed acted in his official ca-
pacity when he silenced Lindke's speech.

When a government official posts about job-related topics
on social media, it can be difficult to tell whether the speech
is official or private. We hold that such speech is attribut-
able to the State only if the official (1) possessed actual au-
thority to speak on the State's behalf, and (2) purported to

exercise that authority when he spoke on social media.

## I

### A

Sometime before 2008, while he was a college student, James Freed created a private Facebook profile that he shared only with "friends." In Facebook lingo, "friends" are not necessarily confidants or even real-life acquaintances. Users become "friends" when one accepts a "friend request" from another; after that, the two can generally see and comment on one another's posts and photos. When Freed, an avid Facebook user, began nearing the platform's 5,000-friend limit, he converted his profile to a public "page." This meant that *anyone* could see and comment on his posts. Freed chose "public figure" for his page's category, "James Freed" for its title, and "JamesRFreed1" as his username. Facebook did not require Freed to satisfy any special criteria either to convert his Facebook profile to a public page or to describe himself as a public figure.

In 2014, Freed was appointed city manager of Port Huron, Michigan, and he updated his Facebook page to reflect the new job. For his profile picture, Freed chose a photo of himself in a suit with a city lapel pin. In the "About" section, Freed added his title, a link to the city's website, and the city's general email address. He described himself as "Daddy to Lucy, Husband to Jessie and City Manager, Chief Administrative Officer for the citizens of Port Huron, MI."

As before his appointment, Freed operated his Facebook page himself. And, as before his appointment, Freed posted prolifically (and primarily) about his personal life. He uploaded hundreds of photos of his daughter. He shared about outings like the Daddy Daughter Dance, dinner with his wife, and a family nature walk. He posted Bible verses, updates on home-improvement projects, and pictures of his dog, Winston.

Freed also posted information related to his job. He described mundane activities, like visiting local high schools, as well as splashier ones, like starting reconstruction of the city's boat launch. He shared news about the city's efforts to streamline leaf pickup and stabilize water intake from a local river. He highlighted communications from other city officials, like a press release from the fire chief and an annual financial report from the finance department. On occasion, Freed solicited feedback from the public—for instance, he once posted a link to a city survey about housing and encouraged his audience to complete it.

Freed's readers frequently commented on his posts, sometimes with reactions (for example, "Good job it takes skills" on a picture of his sleeping daughter) and sometimes with questions (for example, "Can you allow city residents to have chickens?"). Freed often replied to the comments, including by answering inquiries from city residents. (City residents can have chickens and should "call the Planning Dept for details.") He occasionally deleted comments that he thought were "derogatory" or "stupid."

After the COVID–19 pandemic began, Freed posted about that. Some posts were personal, like pictures of his family spending time at home and outdoors to "[s]tay safe" and "[s]ave lives." Some contained general information, like case counts and weekly hospitalization numbers. Others related to Freed's job, like a description of the city's hiring freeze and a screenshot of a press release about a relief package that he helped prepare.

Enter Kevin Lindke. Unhappy with the city's approach to the pandemic, Lindke visited Freed's page and said so. For example, in response to one of Freed's posts, Lindke commented that the city's pandemic response was "abysmal" and that "the city deserves better." When Freed posted a photo of himself and the mayor picking up takeout from a local restaurant, Lindke complained that while "residents [we]re suffering," the city's leaders were eating at an

expensive restaurant "instead of out talking to the commu-
nity." Initially, Freed deleted Lindke's comments; ulti-
mately, he blocked him. Once blocked, Lindke could see
Freed's posts but could no longer comment on them.

## B

Lindke sued Freed under 42 U. S. C. §1983, alleging that
Freed had violated his First Amendment rights. As Lindke
saw it, he had the right to comment on Freed's Facebook
page, which he characterized as a public forum. Freed,
Lindke claimed, had engaged in impermissible viewpoint
discrimination by deleting unfavorable comments and
blocking the people who made them.

The District Court granted summary judgment to Freed.
Because only state action can give rise to liability under
§1983, Lindke's claim depended on whether Freed acted in
a "private" or "public" capacity. 563 F. Supp. 3d 704, 714
(ED Mich. 2021). The "prevailing personal quality of
Freed's post[s]," the absence of "government involvement"
with his account, and the lack of posts conducting official
business led the court to conclude that Freed managed his
Facebook page in his private capacity, so Lindke's claim
failed. *Ibid.*

The Sixth Circuit affirmed. It noted that "the caselaw is
murky as to when a state official acts personally and when
he acts officially" for purposes of §1983. 37 F. 4th 1199,
1202 (2022). To sort the personal from the official, that
court "asks whether the official is 'performing an actual or
apparent duty of his office,' or if he could not have behaved
as he did 'without the authority of his office.'" *Id.*, at 1203
(quoting *Waters* v. *Morristown*, 242 F. 3d 353, 359 (CA6
2001)). Applying this precedent to the social-media context,
the Sixth Circuit held that an official's activity is state ac-
tion if the "text of state law requires an officeholder to main-
tain a social-media account," the official "use[s] . . . state re-
sources" or "government staff" to run the account, or the

"accoun[t] belong[s] to an office, rather than an individual officeholder." 37 F. 4th, at 1203–1204. These situations, the Sixth Circuit explained, make an official's social-media activity "'fairly attributable'" to the State. *Id.*, at 1204 (quoting *Lugar* v. *Edmondson Oil Co.*, 457 U. S. 922, 937 (1982)). And it concluded that Freed's activity was not.

The Sixth Circuit's approach to state action in the social-media context differs from that of the Second and Ninth Circuits, which focus less on the connection between the official's authority and the account and more on whether the account's appearance and content look official. See, *e.g.*, *Garnier* v. *O'Connor-Ratcliff*, 41 F. 4th 1158, 1170–1171 (CA9 2022); *Knight First Amdt. Inst. at Columbia Univ.* v. *Trump*, 928 F. 3d 226, 236 (CA2 2019), vacated as moot *sub nom. Biden* v. *Knight First Amdt. Inst. at Columbia Univ.*, 593 U. S. \_\_\_ (2021). We granted certiorari. 598 U. S. \_\_\_ (2023).

## II

Section 1983 provides a cause of action against "[e]very person who, *under color of any statute, ordinance, regulation, custom, or usage, of any State*" deprives someone of a federal constitutional or statutory right. (Emphasis added.) As its text makes clear, this provision protects against acts attributable to a State, not those of a private person. This limit tracks that of the Fourteenth Amendment, which obligates *States* to honor the constitutional rights that §1983 protects. §1 ("No *State* shall . . . nor shall any *State* deprive . . . " (emphasis added)); see also *Lugar*, 457 U. S., at 929 ("[T]he statutory requirement of action 'under color of state law' and the 'state action' requirement of the Fourteenth Amendment are identical"). The need for governmental action is also explicit in the Free Speech Clause, the guarantee that Lindke invokes in this case. Amdt. 1 ("*Congress* shall make no law . . . abridging the freedom of speech . . . " (emphasis added)); see also *Manhattan Community Access*

*Corp.* v. *Halleck*, 587 U. S. 802, 808 (2019) ("[T]he Free
Speech Clause prohibits only *governmental* abridgment of
speech," not "*private* abridgment of speech"). In short, the
state-action requirement is both well established and rein-
forced by multiple sources.[1]

In the run-of-the-mill case, state action is easy to spot.
Courts do not ordinarily pause to consider whether §1983
applies to the actions of police officers, public schools, or
prison officials. See, *e.g.*, *Graham* v. *Connor*, 490 U. S. 386,
388 (1989) (police officers); *Tinker* v. *Des Moines Independ-
ent Community School Dist.*, 393 U. S. 503, 504–505 (1969)
(public schools); *Estelle* v. *Gamble*, 429 U. S. 97, 98 (1976)
(prison officials). And, absent some very unusual facts, no
one would credit a child's assertion of free speech rights
against a parent, or a plaintiff's complaint that a nosy
neighbor unlawfully searched his garage.

Sometimes, however, the line between private conduct
and state action is difficult to draw. *Griffin* v. *Maryland* is
a good example. 378 U. S. 130 (1964). There, we held that
a security guard at a privately owned amusement park en-
gaged in state action when he enforced the park's policy of
segregation against black protesters. *Id.*, at 132–135.
Though employed by the park, the guard had been "depu-
tized as a sheriff of Montgomery County" and possessed
"'the same power and authority'" as any other deputy sher-
iff. *Id.*, at 132, and n. 1. The State had therefore allowed
its power to be exercised by someone in the private sector.
And the source of the power, not the identity of the em-
ployer, controlled.

By and large, our state-action precedents have grappled

───────────

[1] Because local governments are subdivisions of the State, actions
taken under color of a local government's law, custom, or usage count as
"state" action for purposes of §1983. See *Monell* v. *New York City Dept.
of Social Servs.*, 436 U. S. 658, 690–691 (1978). And when a state or
municipal employee violates a federal right while acting "under color of
law," he can be sued in an individual capacity, as Freed was here.

with variations of the question posed in *Griffin*: whether a nominally private person has engaged in state action for purposes of §1983. See, *e.g.*, *Marsh* v. *Alabama*, 326 U. S. 501, 502–503 (1946) (company town); *Adickes* v. *S. H. Kress & Co.*, 398 U. S. 144, 146–147 (1970) (restaurant); *Flagg Bros., Inc.* v. *Brooks*, 436 U. S. 149, 151–152 (1978) (warehouse company). Today's case, by contrast, requires us to analyze whether a *state official* engaged in state action or functioned as a private citizen. This Court has had little occasion to consider how the state-action requirement applies in this circumstance.

The question is difficult, especially in a case involving a state or local official who routinely interacts with the public. Such officials may look like they are always on the clock, making it tempting to characterize every encounter as part of the job. But the state-action doctrine avoids such broad-brush assumptions—for good reason. While public officials can act on behalf of the State, they are also private citizens with their own constitutional rights. By excluding from liability "acts of officers in the ambit of their personal pursuits," *Screws* v. *United States*, 325 U. S. 91, 111 (1945) (plurality opinion), the state-action requirement "protects a robust sphere of individual liberty" for those who serve as public officials or employees, *Halleck*, 587 U. S., at 808.

The dispute between Lindke and Freed illustrates this dynamic. Freed did not relinquish his First Amendment rights when he became city manager. On the contrary, "the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Garcetti* v. *Ceballos*, 547 U. S. 410, 417 (2006). This right includes the ability to speak about "information related to or learned through public employment," so long as the speech is not "itself ordinarily within the scope of [the] employee's duties." *Lane* v. *Franks*, 573 U. S. 228, 236, 240 (2014). Where the right exists, "editorial control over speech and speakers on [the public employee's]

properties or platforms" is part and parcel of it. *Halleck*, 587 U. S., at 816. Thus, if Freed acted in his private capacity when he blocked Lindke and deleted his comments, he did not violate Lindke's First Amendment rights—instead, he exercised his own.

So Lindke cannot hang his hat on Freed's status as a state employee. The distinction between private conduct and state action turns on substance, not labels: Private parties can act with the authority of the State, and state officials have private lives and their own constitutional rights. Categorizing conduct, therefore, can require a close look.

## III

A close look is definitely necessary in the context of a public official using social media. There are approximately 20 million state and local government employees across the Nation, with an extraordinarily wide range of job descriptions—from Governors, mayors, and police chiefs to teachers, healthcare professionals, and transportation workers. Many use social media for personal communication, official communication, or both—and the line between the two is often blurred. Moreover, social media involves a variety of different and rapidly changing platforms, each with distinct features for speaking, viewing, and removing speech. The Court has frequently emphasized that the state-action doctrine demands a fact-intensive inquiry. See, *e.g.*, *Reitman* v. *Mulkey*, 387 U. S. 369, 378 (1967); *Gilmore* v. *Montgomery*, 417 U. S. 556, 574 (1974). We repeat that caution here.

That said, our precedent articulates principles that govern cases analogous to this one. For the reasons we explain below, a public official's social-media activity constitutes state action under §1983 only if the official (1) possessed actual authority to speak on the State's behalf, and (2) purported to exercise that authority when he spoke on social media. The appearance and function of the social-media activity are relevant at the second step, but they cannot make

up for a lack of state authority at the first.

## A

The first prong of this test is grounded in the bedrock requirement that "the conduct allegedly causing the deprivation of a federal right be *fairly attributable to the State*." *Lugar*, 457 U. S., at 937 (emphasis added). An act is not attributable to a State unless it is traceable to the State's power or authority. Private action—no matter how "official" it looks—lacks the necessary lineage.

This rule runs through our cases. *Griffin* stresses that the security guard was "possessed of state authority" and "purport[ed] to act under that authority." 378 U. S., at 135. *West* v. *Atkins* states that the "traditional definition" of state action "requires that the defendant . . . have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" 487 U. S. 42, 49 (1988) (quoting *United States* v. *Classic*, 313 U. S. 299, 326 (1941)). *Lugar* emphasizes that state action exists only when "the claimed deprivation has resulted from the exercise of a right or privilege having its source in state authority." 457 U. S., at 939; see also, *e.g.*, *Edmonson* v. *Leesville Concrete Co.*, 500 U. S. 614, 620 (1991) (describing state action as the "exercise of a right or privilege having its source in state authority"); *Screws*, 325 U. S., at 111 (plurality opinion) (police-officer defendants "were authorized to make an arrest and to take such steps as were necessary to make the arrest effective"). By contrast, when the challenged conduct "entail[s] functions and obligations in no way dependent on state authority," state action does not exist. *Polk County* v. *Dodson*, 454 U. S. 312, 318–319 (1981) (no state action because criminal defense "is essentially a private function . . . for which state office and authority are not needed"); see also *Jackson* v. *Metropolitan Edison Co.*, 419 U. S. 345, 358–359 (1974).

Lindke's focus on appearance skips over this crucial step.

He insists that Freed's social-media activity constitutes state action because Freed's Facebook page looks and functions like an outlet for city updates and citizen concerns. But Freed's conduct is not attributable to the State unless he was "possessed of state authority" to post city updates and register citizen concerns. *Griffin*, 378 U. S., at 135. If the State did not entrust Freed with these responsibilities, it cannot "fairly be blamed" for the way he discharged them. *Lugar*, 457 U. S., at 936. Lindke imagines that Freed can conjure the power of the State through his own efforts. Yet the presence of state authority must be real, not a mirage.

Importantly, Lindke must show more than that Freed had *some* authority to communicate with residents on behalf of Port Huron. The alleged censorship must be connected to speech on a matter within Freed's bailiwick. For example, imagine that Freed posted a list of local restaurants with health-code violations and deleted snarky comments made by other users. If public health is not within the portfolio of the city manager, then neither the post nor the deletions would be traceable to Freed's state authority—because he had none. For state action to exist, the State must be "responsible for the specific conduct of which the plaintiff complains." *Blum* v. *Yaretsky*, 457 U. S. 991, 1004 (1982) (emphasis deleted). There must be a tie between the official's authority and "the gravamen of the plaintiff's complaint." *Id.*, at 1003.

To be clear, the "[*m*]*isuse* of power, possessed by virtue of state law," constitutes state action. *Classic*, 313 U. S., at 326 (emphasis added); see also, *e.g.*, *Screws*, 325 U. S., at 110 (plurality opinion) (state action where "the power which [state officers] were authorized to exercise was misused"). While the state-action doctrine requires that the State have granted an official the type of authority that he used to violate rights—*e.g.*, the power to arrest—it encompasses cases where his "particular action"—*e.g.*, an arrest made with excessive force—violated state or federal law. *Griffin*,

378 U. S., at 135; see also *Home Telephone & Telegraph Co.* v. *Los Angeles*, 227 U. S. 278, 287–288 (1913) (the Fourteenth Amendment encompasses "abuse by a state officer . . . of the powers possessed"). Every §1983 suit alleges a misuse of power, because no state actor has the authority to deprive someone of a federal right. To misuse power, however, one must possess it in the first place.

Where does the power come from? Section 1983 lists the potential sources: "statute, ordinance, regulation, custom, or usage." Statutes, ordinances, and regulations refer to written law through which a State can authorize an official to speak on its behalf. "Custom" and "usage" encompass "persistent practices of state officials" that are "so permanent and well settled" that they carry "the force of law." *Adickes*, 398 U. S., at 167–168. So a city manager like Freed would be authorized to speak for the city if written law like an ordinance empowered him to make official announcements. He would also have that authority even in the absence of written law if, for instance, prior city managers have purported to speak on its behalf and have been recognized to have that authority for so long that the manager's power to do so has become "permanent and well settled." *Id.*, at 168. And if an official has authority to speak for the State, he may have the authority to do so on social media even if the law does not make that explicit.

Determining the scope of an official's power requires careful attention to the relevant statute, ordinance, regulation, custom, or usage. In some cases, a grant of authority over particular subject matter may reasonably encompass authority to speak about it officially. For example, state law might grant a high-ranking official like the director of the state department of transportation broad responsibility for the state highway system that, in context, includes authority to make official announcements on that subject. At the same time, courts must not rely on "'excessively broad job descriptions'" to conclude that a government employee is

authorized to speak for the State. *Kennedy* v. *Bremerton School Dist.*, 597 U. S. 507, 529 (2022) (quoting *Garcetti*, 547 U. S., at 424). The inquiry is not whether making official announcements *could* fit within the job description; it is whether making official announcements is *actually* part of the job that the State entrusted the official to do.

In sum, a defendant like Freed must have actual authority rooted in written law or longstanding custom to speak for the State. That authority must extend to speech of the sort that caused the alleged rights deprivation. If the plaintiff cannot make this threshold showing of authority, he cannot establish state action.

B

For social-media activity to constitute state action, an official must not only have state authority—he must also purport to use it. *Griffin*, 378 U. S., at 135. State officials have a choice about the capacity in which they choose to speak. "[G]enerally, a public employee" purports to speak on behalf of the State while speaking "in his official capacity or" when he uses his speech to fulfill "his responsibilities pursuant to state law." *West*, 487 U. S., at 50. If the public employee does not use his speech in furtherance of his official responsibilities, he is speaking in his own voice.

Consider a hypothetical from the offline world. A school board president announces at a school board meeting that the board has lifted pandemic-era restrictions on public schools. The next evening, at a backyard barbecue with friends whose children attend public schools, he shares that the board has lifted the pandemic-era restrictions. The former is state action taken in his official capacity as school board president; the latter is private action taken in his personal capacity as a friend and neighbor. While the substance of the announcement is the same, the context—an official meeting versus a private event—differs. He invoked his official authority only when he acted as school board

president.

The context of Freed's speech is hazier than that of the hypothetical school board president. Had Freed's account carried a label (*e.g.*, "this is the personal page of James R. Freed") or a disclaimer (*e.g.*, "the views expressed are strictly my own"), he would be entitled to a heavy (though not irrebuttable) presumption that all of the posts on his page were personal. Markers like these give speech the benefit of clear context: Just as we can safely presume that speech at a backyard barbeque is personal, we can safely presume that speech on a "personal" page is personal (absent significant evidence indicating that a post is official).[2] Conversely, context can make clear that a social-media account purports to speak for the government—for instance, when an account belongs to a political subdivision (*e.g.*, a "City of Port Huron" Facebook page) or is passed down to whomever occupies a particular office (*e.g.*, an "@PHuronCityMgr" Instagram account). Freed's page, however, was not designated either "personal" or "official," raising the prospect that it was "mixed use"—a place where he made some posts in his personal capacity and others in his capacity as city manager.

Categorizing posts that appear on an ambiguous page like Freed's is a fact-specific undertaking in which the post's content and function are the most important considerations. In some circumstances, the post's content and

———————

[2] An official cannot insulate government business from scrutiny by conducting it on a personal page. The Solicitor General offers the particularly clear example of an official who designates space on his nominally personal page as the official channel for receiving comments on a proposed regulation. Because the power to conduct notice-and-comment rulemaking belongs exclusively to the State, its exercise is necessarily governmental. Similarly, a mayor would engage in state action if he hosted a city council meeting online by streaming it only on his personal Facebook page. By contrast, a post that is compatible with either a "personal capacity" or "official capacity" designation is "personal" if it appears on a personal page.

function might make the plaintiff's argument a slam dunk. Take a mayor who makes the following announcement exclusively on his Facebook page: "Pursuant to Municipal Ordinance 22.1, I am temporarily suspending enforcement of alternate-side parking rules." The post's express invocation of state authority, its immediate legal effect, and the fact that the order is not available elsewhere make clear that the mayor is purporting to discharge an official duty. If, by contrast, the mayor merely repeats or shares otherwise available information—for example, by linking to the parking announcement on the city's webpage—it is far less likely that he is purporting to exercise the power of his office. Instead, it is much more likely that he is engaging in private speech "relate[d] to his public employment" or "concern[ing] information learned during that employment." *Lane*, 573 U. S., at 238.

Hard-to-classify cases require awareness that an official does not necessarily purport to exercise his authority simply by posting about a matter within it. He might post job-related information for any number of personal reasons, from a desire to raise public awareness to promoting his prospects for reelection. Moreover, many public officials possess a broad portfolio of governmental authority that includes routine interaction with the public, and it may not be easy to discern a boundary between their public and private lives. Yet these officials too have the right to speak about public affairs in their personal capacities. See, *e.g.*, *id.*, at 235–236. Lest any official lose that right, it is crucial for the plaintiff to show that the official is purporting to exercise state authority in specific posts. And when there is doubt, additional factors might cast light—for example, an official who uses government staff to make a post will be hard pressed to deny that he was conducting government business.

One last point: The nature of the technology matters to the state-action analysis. Freed performed two actions to

which Lindke objected: He deleted Lindke's comments and blocked him from commenting again. So far as deletion goes, the only relevant posts are those from which Lindke's comments were removed. Blocking, however, is a different story. Because blocking operated on a page-wide basis, a court would have to consider whether Freed had engaged in state action with respect to any post on which Lindke wished to comment. The bluntness of Facebook's blocking tool highlights the cost of a "mixed use" social-media account: If page-wide blocking is the only option, a public official might be unable to prevent someone from commenting on his personal posts without risking liability for also preventing comments on his official posts.[3] A public official who fails to keep personal posts in a clearly designated personal account therefore exposes himself to greater potential liability.

\*          \*          \*

The state-action doctrine requires Lindke to show that Freed (1) had actual authority to speak on behalf of the State on a particular matter, and (2) purported to exercise that authority in the relevant posts. To the extent that this test differs from the one applied by the Sixth Circuit, we vacate its judgment and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

---

[3] On some platforms, a blocked user might be unable even to *see* the blocker's posts. See, *e.g.*, *Garnier* v. *O'Connor-Ratcliff*, 41 F. 4th, 1158, 1164 (CA9 2022) (noting that "on Twitter, once a user has been 'blocked,' the individual can neither interact with nor view the blocker's Twitter feed"); *Knight First Amdt. Inst. at Columbia Univ.* v. *Trump*, 928 F. 3d 226, 231 (CA2 2019) (noting that a blocked user is unable to see, reply to, retweet, or like the blocker's tweets).